UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

U.S.C.A. – 7th Circuit
RECEIVED
SEP 07 2021

DeAndre Cherry
Petitioner - Appellant
v.
No. 21-2231
UNITED STATES OF AMERICA
Respondent - Appellee

# MOTION PURSUANT TO FED. R. APP. PROC 22 (b)(2) FOR A CERTIFICATE OF APPEALABILITY

Now Comes the Petitioner, DeAndre Cherry, prose, Petitioner is a non-lawyer, prose, incarcerated litigant, as such, Petitioner ask this Court to follow the direction or the United States Supreme Court in Haines v. Kerner, 404 U.S. 519, 92 S.Ct 594, 30 L.Ed. 2d. 652 (1972). There the Court stated that Courts should hold prose pleadings "to a less stringent standards than formal pleadings drafted by lawyers".

Mr. Cherry seeks a Certificate of Appealability in accord with the rule of Law articulated in Miller-El v. Cockrell, 537 U.S 322, 336 (2003).

To procure a Certificate, the Petitioner must show that a reasonable jurist could debate whether the district Court should have resolved his § 2255 motion and Fed. R. Civ. Proc. 59 (e) motion differently, 537 U.S at 336. The Petitioner need not show that some jurist would have granted the petition Id. at 338. Rather, the Petitioner need "only demonstrate that a reasonable jurist could find the district Court's resolution debatable".

See also, 28 U.S.C § 2253 (c)(3); Flores-Ramirez v. Foster, 811 F.3d 861, 865 (7th Cir. 2016).

In light of the facts stated below, in accord with Flores-Ramirez, supra, there is no doubt that Petitioner is entitled to a Certificate of Appealability, not only because jurist of reason would find his meritorious issue debatable, but because he has demonstrated a "showing of the denial of several Constitutional Rights." Miller-El, 537 U.S. at 336.

Ground One of Petitioner § 2255 deals with the illegal arrest of Mr. Cherry, the illegal search of his vehicle, and the Court's misapplication of law, and failure to recognize controlling precedents, which renders a miscarriage of justice in the instant case.

The Fourth Amendment to the United States Constitution guarantees that:

The right of the people to be secure in their persons, house's, papers and effects against unreasonable searches, and seizures, shall not be violated and no warrants shall issue, but upon probable cause supported by oath or affirmation, and particularly describing the places to be searched and the persons or thing to be seized. U.S. CONST. AMEND. IV

The Fourth Amendment requires that "probable cause be individualized," not just to the time of arrest, but "specific to each defendant." See Ybarra v. Illinois 444 U.S. 85, 91 (1979)

It's CLEAR from the Record that there was "NO" investigation leading up to the illegal seizure of Mr. Cherry

person on the date of May 31, 2012.

The Record also makes clear that the instant case is a Warrantless Arrest Scenario, and as required by law, the Court is to presumed a warrantless Arrest Unreasonable. The Federal Constitution permits a police officer to arrest a suspect without a warrant, if there is probable cause to believe that the suspect has committed or is committing an offense; probable cause to justify an arrest without a warrant means "facts and circumstances within the arresting officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing under the circumstances shown that the suspect has committed, or is committing, or is about to commit an offense. Michigan v. DeFillippo, 443 U.S 31, 61 L.Ed 2d 343, 99 S.Ct 2627. The government has failed to show that Mr. Cherry had committed, was committing, or was about to commit an offense.

The officer(s) in the instant case testified at the Suppression hearing (Supp.hr.) and at Trial (TR.) that prior to Mr. Cherry arrest;

1. Officer(s) knew nothing about Mr Cherry (Supp.hr. pg 30).
2. Officer(s) did not corroborate any of the confidential informant (CI) allegations that Mr. Cherry was engaged in any criminal activity, not by what they heard or seen. (Supp.hr. pgs 24 & 25).
3. The Lead Agent David Brazac testified "that based on his experience and training, that he have to be very cautious and

careful in deciding to trust somebody like the C.I. (supp. hr. pgs 20-21) Proof of his state of mind, that he was acting on the word of an newly arrested-unreliable informant.

So based on these facts, it can be debatable by a jurist of reason that law enforcement violated Mr. Cherry Fourth Amendment Constitutional Right by seizing his person, without the Constitutional requirement of establishing Probable Cause first. A reasonable jurist in the Court of U.S. v. Johnson, 170 F.3d 708, 710 (7th Cir. 1999) stated "Generalized suspicion alone is not enough to justify a warrantless ... seizure of a person". A reasonable jurist in the Court of Ybarra v. Illinois, 444 U.S. 85, 91 (1979) stated "a person's mere propinquity to other's independently suspected for Criminal activity does not, without more, give rise to Probable Cause." A reasonable jurist in the Court of U.S. v. Heath, 188 F.3d 916, 922 (7th Cir. 1999) stated "It is not unlawful for Someone to be in the company of another". Another reasonable jurist in the Court of U.S. v. Ellis, 499 F.3d at 690 (7th Cir. 2007) stated "mere presence at the scene of a crime is not enough to establish Probable Cause".

In accord with Supra, Wong Sun v. U.S., 371, U.S. 471, 484 (1963) when evidence is obtained as the results of a Fourth Amendment violation, it "Must" be suppressed. Where there is no evidence, the government is force to drop all charges against Mr. Cherry.

When a warrantless search or seizure has occurred, the government bears the burden of proving compliance with the Fourth Amendment, (not Judges, but the prosecutor bears the burden.) by a preponderance of the evidence. U.S. v. Garcia-Garcia, 633 F.3d 608, 612 (7th Cir. 2011) Based solely on the "Facts" of the Record, the government has not met it's burden in the case at bar. Wherefore, Ground one of Petitioner § 2255 and 59(e) motion should be granted a Certificate of Appealability based upon Mr. Cherry meritorious and Constitutional claims does appear debatable, which is what is required by Governing Law to obtain a C.O.A. See supra, Flores-Ramirez v. Foster, 811 F.3d 861, 865 (7th Cir. 2016) See also, Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) See also, 28 U.S.C § 2253 (c)(3)

The next issue in Ground One deals with the destruction of Evidence by law Enforcement, namely, the Camera which was used to photograph the evidence, after the Suppression hearing, Castaneda took it upon himself to sell the Camera, of all places, he chose a Garage Sale, leaving no chances of recovery. A reasonable jurist would find it debatable that Castaneda intentionally destroyed the Camera; Mr. Cherry argues that this act by Castaneda constitutes a Due Process violation Under the Brady Rule.

In accord with, U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed 2d 481 (1985), the court clarified the standard of review when exculpatory evidence is suppressed. First, the Bagley court rejected a distinction between cases when there was

a specific request for exculpatory evidence and no request. Bagley set out a three part test for obtaining relief based on suppression of exculpatory evidence.

1. The prosecution withheld or suppressed evidence.
2. The evidence was favorable to the defense.
3. The evidence was material to either guilt or punishment

Under Bagley the materiality test is met and a new trial required if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. This reasonable probability is define as "a probability sufficient to undermine confidence in the outcome". 473 U.S. at 682, 105 S.Ct. at 3383.

It's clear from the record that Castaneda withheld and/or suppressed the camera when he sold it at a Garage Sale. Under the Brady Rule, the Court stated that "ALL" evidence must be preserved up until a defendant goes to trial. The Metadata would have provided conclusive evidence of the order in which photos were taken and where they were taken. The government knew at the time of the suppression hearing that the order in which the photos were taken would be a issue. Castaneda testified that it's general practice to photograph evidence the way it appears on the scene without manipulating it. See Supp. hr. pg 105, 10-9, See Also, Supp. hr. pg. 109, 13-22.

Three part test met because had Castaneda not withheld the Camera for inspection, the Metadata would have shown that the first picture taken was of the briefcase being closed. The Metadata

Exposes the government fabrication about the drugs being in plainview. A reasonable jurist would find it debatable that the government is fabricating the details of the arrest, and supporting the illegal conduct of law enforcement for the sole purpose of securing an illegal and unconstitutional conviction. Mr. Cherry has demonstrated what is required to obtain relief under Bagley which is a probability sufficient to undermine confidence in the outcome. 473 US at 682, 105 S.ct at 3383. Ground one should be granted a Certificate of Appealability due to the above mentioned, which is in compliance with the Governing Law. See Carey v. Duckworth 738 F.2d 875 (7th Cir. 1984) "prosecution can not evade Brady requirements by keeping itself ignorant of information". See Also, Jones v Chicago, 856 F.2d 985 (7th Cir. 1988) "criticizing police for withholding information from prosecution in order to circumvent Brady Rule". See Also, Youngblood v. West Virginia, 547 U.S. 867, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) "Brady requires the government to disclose evidence which relates to impeachment as well as exculpatory evidence: It also applies to evidence known only to the police and not the prosecutors". See Also; Long v. Hooks, Case No. 18-6980, 2020 U.S. App. LEXIS 27138 (4th Cir. Aug 24, 2020) "The Rule is not that only unassailable evidence must be disclosed to the defense. Rather, it is clearly established federal law that any favorable and material evidence must be disclosed".

Under the plain [redacted] error doctrine, Mr. Cherry assert that the district Court and Court of Appeals findings of establishing Probable Cause to arrest, is based on fabrication which the Court

clearly missed or ignored altogether. To satisfy plain error review, however, the error must have been plain and must have affected Cherry's substantial rights before the Court will exercise their discretion to correct it. See United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed. 2d 508 (1993). And even then, the Court will exercise that discretion only if the error "seriously affect(s) the fairness, integrity, or public reputation of judicial proceedings." Id at 736. (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)).

An error is plain if it is "clear or obvious, rather than subject to reasonable dispute." Puckett v. United States, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed. 2d 266 (2009). That is to say that "while the error must be straightforward, it can be so in hindsight". United States v. Caputo, 978 F.2d 972, 975 (7th Cir. 1992). The error must be plain, "but it needn't be blatant". Id. Mr. Cherry objected to the probable cause determination and the destruction of the camera which is a Brady violation, reasons he now makes in his 2255 and 59(e) motions. That the precise issue and arguments were raised shows that the error was clear, and that a Constitutional violation has occurred. The Court did not recognized or even consider that there was no articulable suspicion corroborated by officers that Mr Cherry was meeting the informant to engaged in a drug deal. If the court goes back to their ruling and review the Freeman case they used to validate their opinion, The Courts will find in Freeman, 691 F.3d 893 (7th Cir. 2012) The informant telephone a raspy-voiced man who agreed to meet him and sell him crack at a Sav-A-Lot parking lot.

It is this act by the informant which corroborates for law enforcement that Freeman, or whoever the raspy voice man maybe, is about to commit an offense, and that he is engaged in criminal activity. This is the type of corroboration that is missing from Cherry. A jurist of reason would find that Freeman is the incorrect guide post, and this is where the misappiication of law becomes clear and obvious.

See Supp. Tr. pg. 30. 1-12

1. Q. Okay. Now, at that point in time, when he got into the
2. car, you had never heard Mr. Cherry make any comment about
3. drugs or money at all, had you?
4. A. No.
5. Q. Never heard any discussion between them about a
6. negotiation or a price of any sort, right?
7. A. I couldn't hear anything
8. Q. And, infact, at the time that Mr. Cherry got into the
9. vehicle with the informant, the only thing that you had
10. confirmed was that he was driving this white Mercedes and he
11. was willing to meet the guy, right?
12. A. Correct.

See Supp. Tr pg. 24, 19-25 and pg. 25, 1-2

19. Q. Okay. So there was nothing in the calls that corroborated
20. for you that Mr. Cherry was actually coming there in an
21. attempt to get drugs? All the calls told you, that they were
22. going to meet, right?
23. A. Yes.
24. Q. Okay. During the calls that he made, they did not even

25. corroborate where the original place they were supposed to continue Supp. Tr. pg. 25, 1-2

1. meet at the beginning was, did they?

2. A. No.

See Supp. Tr. pg 6., 7-12

7. A. No. The cooperator was going to - was supposed to meet

8. Mr. Cherry at a residence at 147th and Loomis - I believe

9. that's Markham - and to do it at that residence would be out

10. of our control and it would be dangerous for all parties

11. involved. <u>So we moved the location to 159th Street and Kedzie</u>

12. <u>in Markham in a Stripmall.</u>

This testimony makes it clear that <u>Freeman</u> is not applical to the instant case, it makes clear, officers lacked the necessary reasonable suspicion articulated in the Fourth Amendment of the United States Constitution to arrest Mr. Cherry, it also makes clear that the record is void of any predicted place, or predicted time, therefore, the Court(s) use of these words is a procedural error, and is wholly without foundation, The Record makes clear, that officers created this location and lured Mr. Cherry there. Wherefore, this act by the Court is prejudice towards Mr Cherry because it is a false assesement of the facts of the Record, which the Courts used to validate the illegal seizure of Mr Cherry, denying his guaranteed protection of a Constitutional Right. See <u>United States v. DiDomenico</u>, 78 F.3d 294, 299 (7th Cir.) "If prosecutorial misconduct denies defendant right of Counsel or any other Fundamental Right of a criminal defendant, including the right to an impartial judge, or to trial by jury.

it is reversible error regardless of whether it was prejudicial or harmless. The Due Process Clause requires only that the Proceedings be Fundamentally Fair.... be based on accurate and reliable information. United States v. Wicks, 132 F.3d. 385, 388 (7th Cir. 1997) See also United States v. Hernandez, 58 F 3d 1145, 1149 (7th Cir. 1995) "Bias determination affects core value" ... Wherefore, the Fairness, and integrity of the judicial proceedings is at question concerning the Probable Cause determination; because the information provided to established the Findings is erroneous, Fabrication at best.

To justify the initial contact the totality of the evidence "must" justify a reasonable and articulable suspicion that Mr. Cherry was involved in illegal drug activity. See United States v. Rodriquez, 831 F. 2d 162, 165 (7th Cir. 1981). See also, Beck v. Ohio (1964) 379, U.S. 89, 13 L. Ed. 2d 142, 85 S. ct. 223, "Wherein the Court, holding that Probable Cause for an arrest was lacking, emphasized both the vague Nature of information which a police had allegedly received from an informer, and the lack of any indications, of any indications of any corroboration of such information". The current Probable Cause determination is a direct result of the misapplication of law as argued above, and it's Failure to recognize controlling precedents.

Note: The Affiant Brazac, in his Affidavit for supporting Probable Cause stated that the informant stated he was instructed to deliver 13 kilograms to some guy name Mo. The informant does not even speak with first hand knowledge. The problem Mr Cherry is having is that the Courts is allowing the government to create, and recreate statements that the informant has allegedly told

law enforcement, and use these false statements to validate law enforcement illegal actions, this is why the Confrontation Clause in Ground Six is so vital to discovering the truth surrounding what actually transpired the night Mr. Cherry was arrested. For these reasons a jurist of reason would find it debatable that Mr Cherry was illegally arrested by law enforcement, and that the Court(s) adopted erroneous information in their Factual Findings. A Certificate of Appealability should be granted.

Ground Two deals with the Court(s) misinterpretation of the Record. The Fifth Amendment to the United States Constitution guarantees the Right to Due Process, Due Process guarantees that every defendant shall be judged and prosecuted based on the Facts of the Record. In every opinion issued by the district Court, the judge has included evidence that was clearly not apart of the record, and/or was fabricated evidence which renders Mr. Cherry an unfair proceedings.

The district Court opinion and order dated April 11, 2013 states: the Court reasoning in support of Probable Cause to arrest Mr. Cherry. The Three erroneous information is as follows:

i) "The cooperating defendant called Mc and changed the meeting place to a parking lot at 159th Street and Kedzie in Markham in front of a Boost Mobile Store at 8:00pm." See Supp. hr. pg 24, 24-25 & pg 25, 1-2

Q. Okay. During the calls that he made, they did not even corroborate where the original place were suppose to meet at the beginning was, did they?

A. No.

2) "The meeting of the cooperating defendant and defendant Mc occurred in substantially the manner the cooperating defendant said it would occur"....

Directing the Courts Attention to Supp. hr. pg 6, 7-12

7. A. No. The cooperater was going to - was supposed to meet
8. Mr Cherry at a residence at 147th and Loomis - I believe
9. that's Markham -- and to do it at that residence would be out
10. of our control and it would be dangerous for all parties
11. involved. So we moved the location to 159th Street and Kedzie
12. in Markham in a Stripmall.

3) "The officers also knew from their own observation that just prior to the arrest signal defendant was seen to position himself in such a way as to allow him to look into the back of the cooperating defendant automobile in a manner that would entitle him to view the contents of the narcotic's trap. Upon hearing the police, defendant attempted to run into his car and escape before the police could arrest him, evidencing knowledge of guilt. These facts taken together are sufficient to Establish Probable Cause to arrest the defendant."

Directing the Courts Attention to Supp. hr. pg 12, 5-19, and the Court's memorandum opinion and order [92] dated 5/16/15 pg 3.

5. A. In a short time, maybe three minutes, if that, I observed
6. the cooperating defendant get out of the driver's side of the
7. vehicle, which was the understood prearranged arrest signal
8. So at that point, I called on the Radio that it was an arrest,

And agents moved in to arrest Mr. Cherry at that point I was focusing on the cooperating defendant - he was my responsibility - and other agents were going to arrest Mr. Cherry

Q. Now, can you describe for the Court how far apart the defendant's car was from the cooperator's car?

A. A couple of feet

Q. And when you - you said you were - your responsibility was the cooperating defendant, what did you do?

A. Once I - I pulled up to the vehicle. I saw Mr. Cherry getting out in my peripheral.

The Courts memorandum opinion and order [92] states: "The new evidence seems to corroborate the defendant got out of the cooperating individual's automobile and was immediately confronted by sirens and officer's shouting at him".

By clear and convincing evidence the Court has misinterpret the record, when correctly analyzing the facts of the Record, the Court findings are wholly without foundation.

- The Record is void of any prior meeting that was corroborated by law enforcement
- The Record is void of any predictions alleged by the informant. Infact, the words predicted or prediction is no where to be found in the Record, (Suppression hearing and trial testimonies) however, the affiant David Brazao did include in a footnote in his affidavit in support of Probable Cause that, "the CS has provided predictive factual information that came to fruition

and has provided information that has been independently corroborated by law enforcement. See Supp. hr. pg. 8C, 1-12

1. Q. Okay, now, at that point in time, when he got into the
2. car, you had never heard Mr. Cherry make any comment about
3. drugs or money at all, had you?
4. A. No.
5. Q. Never heard any discussion between them about a
6. negotiation or a price of any sort, right?
7. A. I couldn't hear anything
8. Q. And, infact, at the time that Mr. Cherry got into the
9. vehicle with the informant, the only thing that you had
10. confirmed was that he was driving this White Mercedes and he
11. was willing to meet the guy, right?
12. A. Correct.

See also Supp. hr. pgs 21-25. Here Agent Brazao testified under oath "repeatedly" that he did not corroborated the informant allegation by what he had seen or heard. Wherefore, the words "predictive factual information that came to fruition and has provided information that has been independently corroborated by law enforcement" is just a "BALD BASELESS ASSERTION". A jurist of reason would certainly find this to be fabricated evidence intentionally submitted to mislead the judge in rendering a decision that's favorable to the government.

• The record does not support a finding that just prior to Mr. Cherry arrest, he was seen to position himself in such a way... Upon hearing the police, defendant attempted to run into his car

Escape. Agent Brazao testimony mention above makes it clear that once the informant exited the vehicle, he radioed to all other agents to move in to arrest, so at that moment it was inevitable that Mr. Cherry would be arrested. The problem Mr. Cherry is having with the Courts is that Governing Law states:

> The Fourth Amendment protects "the right of the people to be secure in their persons ... against unreasonable ... seizures." ... See App. 79-80 Brendlin v. California, 551 U.S. 249, 254 (2007) ("A person is seized" whenever officials "restrain his freedom of movement" such that he is "not free to leave"). And that detention was "unreasonable," the complaint continues, because it was based solely on false evidence, rather than supported by probable cause. See App. 79-80; Bailey v. United States, 568 U.S. 186, 192 (2013) ("The general rule is that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime").

Nothing in the record suggests Mr. Cherry had committed or was in the process of committing a crime. Agents arrested Mr. Cherry on a hunch, then fabricated the details of the arrest, and it's these false statements which undermines the Magistrate Shelia Finnegan determination to hold Mr. Cherry in custody, as well as, undermines the district Court Probable Cause determination.

Defense counsels failed to exploit this issue, failed to introduce relevant case law and failed to exhaust all procedural

avenues open to challenging this clear violation of both 7th Circuit and Supreme Court precedent, had Counsel(s) pointed out these false statements to the Court, there is a reasonable probability that, but for Counsel unprofessional errors, the result of the Suppression hearing, and/or the Reconsideration motion would have been different. Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068.

Ground Two should be granted a C.O.A because a jurist of reason would find it debatable that the district Court misinterpret the record and/or use fabricated evidence to render a decision denying Mr. Cherry his substantial and Constitutional Rights.

Ground Three, The Fact that Counsel Andrea Gambino admits that she did not have a trial strategy goes to the core of the Sixth Amendment right to effective assistance is a requirement that Counsel stand up as an adversary to the prosecution. Strickland v. Washington, 466 U.S. at 685 ("The right to Counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to Counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled.") (quoting Adams v. United States, ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268 (1942)).

An attorney strategy can be so ill-chosen as to render a trial fundamentally unfair. See United States v. Rusmisel, 716 F.2d 301, 310 (5th Cir. 1983) No jurist of reason can say with certainty when reviewing Counsel performance at trial that she had a strategy

to vindicate Mr. Cherry, or protect his substantial rights in any kind of way. Defense Counsel resorted to the merely hope of winning at trial based upon discrediting the testimony of the arresting officers. It was incumbent upon defense counsel to offer an alternative theory of the case, namely that Mr. Cherry was entrapped by the government and their newly minted cooperating witness. The Facts of the case shows the government purposely narrowed their case to encompass the offense of possessing the illegal drugs found in Petitioner's vehicle after his arrest. Defense Counsel apparently failed to note the obvious vulnerability this unusual government trial strategy at the appropriate time in their representation, which would have been exposed by an entrapment instruction. As noted in the Seventh Circuit,

"Entrapment is a defense to criminal liability when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." United States v. Mayfield, 771 F.3d 417, 420 (7th Cir. 2014) (en banc). There are two elements to the defense of entrapment: the defendant's lack of predisposition and the government's inducement... Predisposition is the "principal element in the defense of entrapment." United States v. Russell, 411 U.S. 423, 433 (1973). To overcome Barta's entrapment defense, therefore, the government was required to "prove beyond a reasonable doubt ... that there was no government inducement" in this case. Mayfield, 771 F.3d at 443.

The government failed to do so. Inducement "means government solicitation of the crime plus some other government conduct that create a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." Id. at 434-35.
United States v. Barta, 13-3208, (7th Cir. 2015)

In this case, the facts clearly establish that Mr. Cherry was not the subject of a current investigation, and did not have a known or clearly established predisposition to commit an offense. Only after he was contacted by the government's chief witness, the unidentified informant, did he consent to meet to hear what he had to say. The facts also show that he was not **charged** for purchasing drugs from the aforementioned informant, only for possessing the drugs that he had inside his vehicle.

In entrapment cases, "the government must prove beyond a reasonable doubt that a defendant who raises a cognizable defense of entrapment... has not in fact been entrapped." United States v. Theodosopoulos, 48 F.3d 1438, 1444 (7th Cir. 1995). Whether the government has met this burden of proof in a given case is generally a question for a jury. Id at 1445. When a jury decides that the government has met its burden, then a court reviewing that decision must examine "all the evidence in the record in the light most favorable to the government," while still ensuring that "the government 10 No. 13-3208 presented sufficient

evidence to permit a jury to determine beyond a reasonable doubt" that the defendant was not entrapped. Id. Barta p. 9-10

A jurist of reason would find it debatable that a competent defense counsel would have sought an entrapment instruction, given the unusual factual circumstances of Petitioner's arrest, and forced the government to establish that there was no entrapment, which would have forced the court to make the difficult decision of disclosing more information about the confidential informant, and probably requiring the disclosure of the CI identity, and arguably would have changed the result of the case. Ground three should be granted a Certificate of Appealability for the above reasons.

Ground Four rest upon the Court erroneous edition of the guideline range, in light of the United States Supreme Court superseding decision in Mathis v. United States, No. 15-6092, decided June 23, 2016, that seriously undermined the continued validity of this judgement in the present case. The Petitioner further asserts he is actually innocent of his enhancement under the 851 notice which adopts the definition of felony drug offense that is used in 21 U.S.C. § 802 (44). Petitioner asserts that his prior Illinois drug offense under Mathis no longer qualifies as a predicate offense.

At issue in this petition is whether Petitioner prior conviction

under Illinois Statute 720 ILCS 570/401 constitute a Felony drug offense that validly triggered increase enhancement in his mandatory minimum sentence. This issue has already been argued and ruled by the United States Court of Appeals for the Seventh Circuit, under United States v. Ruth, 966 F.3d 642, 2020 U.S. App. LEXIS 22476 No. 20-1034 July 20, 2020. The Court stated that "a Felony drug offense' within the meaning of Federal, we apply the Taylor categorical approach. United States v. Elder, 900 F.3d 491, 497-501 (7th Cir. 2018) (citing Taylor v. United States, 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed. 2d 607 (1990)). Under the categorical approach, courts looks solely to whether the elements of the crime of conviction match the elements of the Federal recidivism statute. Id. at 501. "If, and only if, the elements of the State law mirror or are narrower than the Federal statute can the prior conviction qualify as a predicate felony drug offense." United States v. De La Torre, 940 F.3d 938, 948 (7th Cir. 2019)."

The Ruth court goes on to explain that "the modified categorical approach is just that: a modification of the categorical approach that simply act as a "tool for implementing the categorical approach." Descamps, 570 U.S at 262. "It retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime." Id at 263. To put it more succinctly, the modified categorical approach helps a court find out which crime the defendant was convicted of when the statute lists several alternative crimes. Id. at 263-64.

"The Supreme Court recently clarified its categorical-approach

jurisprudence in Shular v. United States, 140 S.Ct. 779, 206 L.Ed 2d 81 (2020) the Court held that the second categorical methodology- the conduct-based method- applies to determining whether a State offense is a "serious drug offense" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924 (e)(2)(A)(ii) (defining "serious drug offense" as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance"). The Statute's text and context convinced the Court that it undoubtedly described conduct, not names of generic offenses. Therefore, a prior conviction qualifies as a predicate "serious drug offense" and triggers § 924 (e)(2)(A)(ii)'s sentencing enhancement when the predicate offense involves "the conduct of 'manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance'". Id at 787.

The conduct-based categorical approach applies to § 841 (b)(1)(E)'s sentencing enhancement, the term "felony drug offense" describes predicate offenses "that prohibit or restrict conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 802 (44). This unquestionably refers to conduct and not generic offenses. The only task for the Court is determining whether the prior conviction's elements necessarily entail the conduct identified in § 802 (44). Indeed, even before Shular's clarification, this court already implicitly employed the conduct-based categorical methodology for similar "felony drug offense" sentencing enhancements. See, e.g., United States v. Garcia, 948 F.3d 789, 793 (7th Cir. 2020); De La Torre, 940 F.3d at 949;

Elder, 900 F.3d at 497.

Here the government filed an information pursuant to 21 U.S.C. § 851 (a) identifying Mr. Cherry's prior state court conviction under 720 ILCS 570/401 (2)(A). The Illinois statute makes it unlawful to possess with intent to deliver or manufacture "15 grams or more but less than 100 grams of any substance containing cocaine, or an analog thereof. Illinois's schedule of controlled substances define cocaine as:

> Coca leaves and any salt, compound, isomer, salt of an isomer, derivative, or preparation of coca leaves including cocaine or ecgonine, and any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine (for the purpose of this paragraph) (The term "isomer" includes optical, positional and geometric isomers).

720 ILCS 570/206 (b)(4). The Ruth Court stated, For our purposes, the critical language is the final phrase - Illinois's definition of cocaine includes optical, positional, and geometric isomers. Under Federal law, cocaine is defined to include only its "optical and geometric isomers." 21 U.S.C § 812, Schedule II (a)(4); see also id. § 802 (14) ("As used in Schedule II (a)(4), the term 'isomer' means any optical or geometric isomer."); id. § 802 (17) (D) (defining "narcotic drug" to include "[c]ocaine, its salts, optical and geometric isomers, and salts of isomers"). On its face, then, the Illinois statute is categorically broader than the Federal definition.

Based upon Mathis, Descamps, Elder, and Ruth, Mr. Cherry asserts that the Illinois drug statutes use of the identity of an

controlled substance is not an element of the crime. See Scruggs v. City of Fairview Heights, 2014 U.S. Dist. Lexis 36760 (7th Cir. 2014) citing Footnote 2. And since it's undisputed that the Illinois Statute is overbroad that it, criminalizes possession of substances that are not controlled substances in 21 U.S.C § 802(44). Mr. Cherry contends that his 2003 illinois prior conviction on 10/31/2003 can not be used to determine his § 851 notice of enhancement under 21 U.S.C § 802(44).

As noted above, when a state law is drafted in the alternative, the court merely resorts to the approved documents and compare the elements revealed there - to those of the generic offense. Here, an examination of the Shepard documents confirms the Mathis conclusion that 720 Ill. Comp. Stat. 570/401(c)(2) is indivisible.

Mr. Cherry has established by clear and convincing evidence that his 2003 drug conviction in case no. 03CR0020101 can not be used for § 851 enhancement purposes. Cherry contends that his lawyer(s) erred in allowing the court to use the wrong edition of the guidelines. A jurist of reason would find it debatable that Cherry attorney was ineffective and should have raised this issue before, at sentencing, and/or direct appeal, however, Cherry did bring this claim in his § 2255 motion, which is the correct avenue to challenge the validity of a conviction or sentence.

The application of the § 851 enhancement places Cherry with a mandatory minimum of 10 years to life. Mr. Cherry is charged under 841(a)(1)(B)(i), which states, such a person shall be sentenced to a term of imprisonment which may not be less than 5 years and not more than 40 years. The Courts determines the defendant offense level

based upon the maximum range of the defendant mandatory minimum, which in this case, the Court viewed the 10 years to Life as the appropriate mandatory minimum, and according to § 4B1.1 (b) an offense statutory maximum of Life shall result in an offense level of 37, criminal history category 6, yielding a guideline range of 360-to-Life. Under Mathis supra, and Court of Appeals for the Seventh Circuit, Ruth, this is the wrong edition of the guidelines for the Court to have considered.

Without the § 851 Cherry is subjected to a mandatory minimum of 5 to 40 years, according to § 4B1.1 (b) an offense statutory maximum of 25 years or more, shall result in a offense level of 34, yielding a guideline range of 262 to 327 months.

Based solely on these facts, a jurist of reason would find it debatable that Mr. Cherry has been deprived of a fair, and accurate edition of the guidelines in which Congress has set in place for defendants with similiar backgrounds. Had it not been for Counsel(s) ineffective and deficient performance, Mr. Cherry would have **NEVER** been placed at an offense level 37, or a guideline range of 360-to-Life.

Under U.S v. Jaimes-Moreno, 2017 U.S. Dist. Lexis 203438, 2017 WL 8209106, at *10 (N.D. Ill Dec. 11, 2017) (citing Glover v. U.S., 531 U.S. 198, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001)) states: Where counsel's alleged error occurred during the sentencing phase, or Appellate Counsel failed to raise an error that occurred at sentencing, "The Petitioner must show that there was a reasonable probability that he received additional prison time because of Counsel's error".

Petitioner entire time during his pretrial stages was tainted by the government filing of the 851 notice. (20 days after Mr. Cherry arrest 6/20/2012 See docket entry #14) In 2015 the government offers a plea with a guideline range of 360-to-Life, offense level 37, subtract 3 points for acceptance of responsibility, which brings the offense level to 34, category 6, guideline range 262-327 months. (Under Mathis, this is an incorrect guideline range.) The government contends that this was harmless error, because defendant received a below guideline range of 240 months. The government is still incorrect. The correct guideline range is offense level 34, category 6, guideline range 262-327 months. Had it not been for Counsel error, not challenging the 851 notice, and bringing forth the correct edition of the guideline, Mr. Cherry would of been in a better informed position to accurately weigh his options, to either proceed to trial or plea with the opportunity of receiving the 3 points deduction for acceptance of responsibility, which would have resulted in a offense level of 31, category 6, guideline range of 188-235. Petitioner would have been "under" the 240 months he is currently serving. See United States v. Pennington, 667 F.3d 953, 957 (7th Cir. 2011) (quoting Glover v. United States, 531 U.S. 198, 203 (2003)) "Authority does not suggest that a minimum amount of additional jail time in prison can not constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance".

Petitioner avers he would have taken that plea offer, with the condition of being able to preserve all of his appeal rights. The career offender guidelines are advisory, so coming before the judge with the correct offense levels, criminal history category, and guideline ranges, Petitioner

would have had a Fair opportunity to match his sentence according to the accurate information that Congress intended the guidelines to represent, such as, Criminal offense level 24, Criminal History Category 4, guideline range 77-96. This is the correct guideline range without the 4B1.1 career offender enhancement.

77-96 months -to- 188-235 months, the Court could have chosen any number within these guideline ranges. The Point of this argument is that 240 months would not have been an option for the Court to consider, had it not been Counsel(s) ineffective and deficient performance as well as the government misrepresentation and foul play.

Petitioner would like to inform the Court that Ground Four involved discrepencies with the Presentence Investigation Report, as to the number of convictions that is relied upon for the § 4B1.1 career offender enhancement, the criminal history points are calculated incorrectly. So to be clear, Mr. Cherry is challenging all of the erroneous information that supports the § 851 and § 4B1.1 enhancements. The government response to these challenges is also confused and without certainty as to what the PSI meant. Since the government is agreeing that the Machine Gun conviction is not being used as a qualifying offense, even though the PSI on pages 10-11 states in full detail that the Machine Gun conviction is to be considered a "crime of violence". In light of Rollins, 836 F.3d 737 (7th Cir. Aug 16, 2016) Enbac, there is no dispute, according to Seventh Circuit precedent the Machine Gun conviction can not be used for § 4B1.1 career offender enhancement. However, the dispute does come into

play when the government insist in their response on page 50, that "even without either conviction" "in 03CR0020101, Cherry had two qualifiers". This information is incorrect. The PSI merely provided the Court with the case numbers she felt were qualifying convictions at the time it is written, which it states, "The defendant is a career offender based on convictions in Cook County case nos. 93CR1225201; 93CR1225101; and 03CR0020101", but the PSI goes into detail and describe for the Court on page 10, referring to the case nos 93CR1225201, and 93CR1225101, it states, "Pursuant to Guideline 4A1.2(a)(2)(B) No criminal history points are added because these offense's and the offense in the previous paragraph are related in that there was no intervening arrest and defendant was sentenced for these offense's on the same day." "(10/28/94 3-points are added)" Based on this information these case number(s) is to be considered as "ONE" conviction, the government/court can choose either conviction for purposes of applying the 4B1.1 enhancement, but let's be clear, the court can "ONLY" choose "ONE" according to Guideline 4A1.2(a)(2)(B). Based on these facts, if we are to exclude the 03CR0020101 convictions as the government suggests, then Mr. Cherry only has "ONE" conviction that can be considered a qualifier for § 4B1.1 career offender enhancement, which means Mr Cherry does not have the required predicate offense(s) to establish him as a career offender.

PETITIONER WAS PREJUDICED BY THE COURT ERRONEOUS VIEW OF HIS CRIMINAL HISTORY

Directing the Courts attention to Sentencing Transcript pg 37. 7-12:

The defendant criminal history is 11. Leaving aside all career offender considerations, that's a large number. Criminal history category of V, second to the highest you can have. He has multiple prior convictions. Multiple, numerous, for possessions and/or delivery of controlled substances and for crime of violence.

This erroneous view depicts the defendant with a criminal history of 11, the sentencing judge mentioned that this is a large number, second to the highest you can have, the judge goes on to speak on multiple, numerous, convictions. Clearly this information influenced the judge decision making process, and this erroneous information can be said the reason why the judge imposed such a harsh sentence.

The correct criminal history goes as follows:

- Arm Robbery 93CR1225101 } One conviction
- Attempted Murder 93CR1225201 } 3pts

(See Single Sentence Rule)

- Manufacture/delivery 15 to 100 grams of cocaine } 03CR0020101
- Possession of Machine Gun } 3pts
- (See Single Sentence Rule)
- Reckless Conduct - 2pts

<u>Total = 8 criminal history points</u>

Mr. Cherry has no other convictions as an adult to be considered.

Under Seventh Circuit case law, in order to establish prejudice resulting from mistakes made by counsel at sentencing the defendant must show that the sentencing proceeding was unreliable or fundamentally unfair such that the error produced a significant effect on his sentence. Eaters v. United States, 159 F.3d 1043, 1046 (7th Cir. 1998) (citing Durrive v. United States, 4 F.3d 548, 550-51 (7th Cir. 1993)) A defendant has the right to be sentenced on the basis of reliable information. United States v. McClinton, 135 F.3d 1178, 1192 (7th Cir. 1998). The facts on which the Court basis it's sentence must have sufficient indicia of reliability to support it's probable accuracy. United States v McClinton, 135 F.3d 1178, 1192 (7th Cir. 1998). The Due Process Clause requires only that the proceedings be fundamentally fair and the sentence be based on accurate and reliable information. United States v. Wicks, 132 F.3d 383, 388 (7th Cir. 1997). If prosecutorial misconduct denies defendant right of counsel or any other fundamental right of a criminal defendant, "including the right to an impartial judge", or to trial by jury, it is reversible error regardless of whether it was prejudicial or harmless. United States v. DiDomenico, 78 F.3d 294, 299 (7th Cir.), cert denied 117 S.Ct. 507 (1996).

A jurist of reason would certainly find it debatable that the Court was prejudice towards Mr. Cherry from mistakes made by counsel and government at sentencing, also he was sentenced on unreliable information, inaccurate information, all which resulted in a fundamentally unfair proceeding, the § 851 was incorrectly applied, and the government even agrees that the PSI **is** unclear as to

which conviction the Probation officer intended to use for § 4B1.1 Career offender enhancement in case no. 03CR002O1O1, Surprisingly, the government in their response (2255) abandon the convictions in case no. 03CR002O1O1, and stated that they did not need either convictions, Wherefore, A jurist of reason would certainly find that the § 4B1.1 lacks the indicia of reliability to support it's probable accuracy in determining whether or not Mr Cherry actually has the qualifying convictions to consider him a career offender, since there's only one conviction that could qualify for the 4B1.1 enhancement.

Mr. Cherry avers that case nos. 93CR1225101 and 93CR1225201 should not have been considered predicate offenses for purpose's of establishing him as a Career Offender based upon Section 4A1.2 (d), which covers offenses committed prior to age eighteen. Attempting to count every juvenile adjudication would have the potential for creating large disparities due to the differential availability of records. Therefore, for offenses committed prior to age eighteen, only those that resulted in adult sentences of imprisonment exceeding one year and one month, or resulted in imposition of an adult or juvenile sentence or release from confinement on that sentence within five years of the defendant's commencement of the instant offense are counted. To avoid disparities from jurisdiction to jurisdiction in the age at which a defendant is considered a "juvenile," this provision applies to "All" offenses committed prior to age eighteen.

Section 4A1.2(d) is instructive as to which offense the Court can use a prior offense committed before the age of eighteen for §4B1.1 career offender purposes. Mr. Cherry hinges his argument on the last two sentences which instructs the court, "For offenses committed prior to age eighteen, only those that resulted in adult sentences of imprisonment exceeding one year and one month.... within five years of the defendant's commencement of the instant offense are counted. To avoid disparities .... this provision applies to all offenses committed prior to age eighteen.

Mr. Cherry was born March 11, 1976. In 1993, at the time the offenses in case nos 93CR1225101 and 93CR1225201 were committed, Mr. Cherry was only seventeen years of age. Therefore, a jurist of reason would find that this provision as stated applies to "ALL" offenses committed prior to age eighteen. Mr. Cherry was discharged from parole in 2001, the instant offense occurred in 2012,. Mr. Cherry is well beyond the five year commencement of the instant offense, in which the Courts can even consider these case nos. (93CR1225101 and 93CR1225201) as a predicate offense for any enhancement or calculation of criminal history points.

Under § 4A1.2 (d) provision Mr Cherry criminal history points would be five, category 3, offense level 24, guideline range 63-78 months. The Court has imposed a sentence three times the amount Congress intended defendants to have with similiar backgrounds. Based on these facts, Ground Four should be granted a Certificate of Appealability and a full resentencing without the § 851, § 4B1.1, and erroneous information about Mr. Cherry criminal history.

Mr. Cherry contends because his offense(s) in case nos. 93CR1225101 and 93CR1225201 should have been treated as a single sentence under § 4B1.2 (a), (b), and (c), "No more than one prior sentence in a given sentence may be used a predicate offense." Note, however, Cherry's sentence for case nos. 93CR1225101 and 93CR1225201 were imposed eighteen years ago, this should have been obvious to the Court(s), under § 4A1.1 (b) no criminal history points is to be added, because it was not imposed within ten years of the defendant's commencement of the instant offense, and for this reason, under § 4A1.2 (e)(2), accordingly, case nos. 93CR1225101 and 93CR1225201 may not serve as a predicate under the career offender guideline. Also, as mentioned above these offense(s) were committed prior to Cherry's eighteen birthday, Cherry is well-beyond the **FIVE** year commencement of the instant offense under § 4A1.2 (d), the Court(s) erred in sentencing Cherry with the § 4B1.1 career offender enhancement. Had it not been for Counsel(s) ineffective and deficient performance, neglecting to present the applicable law, "4B1.2 (a), (b), (c), 4A1.1 (b), 4A1.2 (e)(2) and 4A1.2 (d)" Mr. Cherry would have been released from Federal prison in 2017 or soon after, a jurist of reason would find that this clearly establish prejudice, considering it's 2021, and leaving this error uncorrected would undermine the fairness, integrity, and public reputation of judicial proceedings. "Authority does not suggest that a minimum amount of additional jail time in prison can not constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance". United States v. Jaimes-Moreno, 2017 U.S. DIST. LEXIS 203438, 2017 WL 8209106, at *10 (N.D. Ill. Dec 11, 2017) (citing Glover v. United States, 531 U.S. 198, 121 S.Ct 696,

148 L.Ed.2d 604 (2001)). Based on these Facts A Certificate of Appealability should granted For Ground Four.

Ground Five centers around the Known False evidence presented by law enforcement and government, which constituted a Due Process violation, clearly an established Fifth Amendment Constitutional Right. In order to prevail on a claim that the government presented False evidence against Mr Cherry, if established, causes a clear violation of a Constitutional "guaranteed" Right to Due Process under the Fifth Amendment.
First, Cherry has to show that there was False testimony,
Secondly, the prosecution Knew or should have Known it was False testimony and lastly, there is a likelihood that the False testimony affected the judgement of the jury. See Morales v. Johnson, 659 F.3d 588, 606 (7th Cir. 2011).

FALSE TESTIMONY PRESENTED BY THE GOVERNMENT

Duly note: CPD officer Gamboa and Agent O'Reilly is together in the same vehicle. (Trial Transcript = Tr.Tr. Suppression Transcript = Supp.Tr.)
O'Reilly testifies at Tr.Tr. pg 296, 6-11 (in short) "moments later, Mr Cherry was also opening his door, and stood up and he was turned around to look inside the back of the Volkswagon".
Gamboa testifies at Tr.Tr. pg 390, 21-22 " Defendant Cherry upon seeing us exit, very quickly tried to get into his vehicle".
Brazac testifies at Supp.Tr. pg 12, 18-19 " Once I -- I pulled up to the vehicle, I saw Mr Cherry getting out in my peripheral vision."
Judge memorandum opinion and order [92] pg 3. (The new evidence represents the informant recording device) "The new evidence seems to corroborate that Defendant got out the cooperating individual's

automobile and was immediately confronted by sirens and officer's shouting at him, "Don't move.. Don't move."

This testimony centers around what the officer(s) seen just prior to the seizure of Mr. Cherry. This testimony is vital to the probable cause determination, because it gives the judge and jury insight as to what was known to officers at the time of arrest. A close review of this testimony reveals the fabrication presented by officer(s), namely O'Reilly, who the Court has used his testimony to deprive Mr. Cherry of his Constitutional Rights. Under the Fourth Amendment which guarantees the right of the people to be secure in their persons ..... against unreasonable searches and seizures, shall not be violated ..... but upon Probable Cause ..... Where a defendant makes a showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, and the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment, as incorporated in the Fourteenth Amendment, requires that a hearing be held at the defendant request. The trial court here therefore erred in refusing to examine the adequacy of Cherry's proffer of misrepresentation. Under Seventh Circuit law, "A police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of his liberty in some way. Falsified evidence will never help a jury perform it's essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process. What's relevant is not the claim, but whether the officers created evidence that they knew to be false. See William D. Avery v.

City of Milwaukee, et al., 847 F.3d 433; 2017 U.S. App. LEXIS 1657 No. 15-3175.

## PROSECUTION KNEW OF FALSE TESTIMONY

The Prosecution knew of the deliberate false statements made by O'Reilly and his fellow officer(s) because of the following reasons:

1) Brazac testimony at the Suppression hearing makes it physically impossible for either officer to have seen, what the other claim they saw. See United States v. Alcantar, 83 F.3d 185, 189 (7th Cir. 1996)

> "Where it is argued that a witness testimony is incredible as a matter of law and should be disregarded by the trier of fact, the Court of Appeals has recognized that "it must have been physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for such an occurrence to have taken place at all."

If Brazac is truthful about the accounts in which he saw, that he left his point of position, traveled to the cooperator vehicle, and from his peripheral vision, he sees Mr. Cherry exiting the vehicle. (See Supp. Tr. pg 12, 5-19) The laws of nature makes it physically impossible for O'Reilly to have seen what he claims took place. O'Reilly version places Cherry outside the vehicle prior to officer(s) approaching the vehicles.

2) Gamboa testimony at trial - sorry for the typo - but allow me to introduce Gamboa correctly. Gamboa is the arresting officer, therefore, there should have been an investigation report written by him detailing the events of the arrest, not just the interrogation, Strangely this is missing from discovery. However, Mr. Cherry had to force

trial Counsel to produce Gambca at trial, and as oddly as that sounds, from his testimony at trial, it's obvious why the prosecution refused to call him as a government witness, because everything he claims to have seen or did makes it physically impossible to have occurred as O'Reilly claims, and duly note, the government did not even cross-examine Gambca in an attempt to correct any false statements made by him, proof - evidence of knowledge that the prosecution was well aware of the false statements presented by law enforcement.

Gambca states: "upon seeing us Cherry exited" (Note: Gambca and O'Reilly is in the same vehicle) So we have Gambca saying Cherry is inside the car, O'Reilly is saying Cherry is outside of the car, Gambca is saying he never had to run after Cherry, O'Reilly is saying he chase Cherry down before Cherry could enter into his vehicle, Gambca is saying he's the first officer to placed hands on Mr. Cherry, and once he placed the handcuffs on, he stood Mr. Cherry up, walked him to the rear of the Mercedes, and stood by him for a while, while the other officer(s) searched the vehicle, O'Reilly is saying once the handcuffs are secured on Cherry, and he preform a protective sweep of the inside of Cherry's vehicle, he picks Cherry up off of the ground, and "immediately" placed Cherry inside of his vehicle, drove away from everyone else, and at that time read Cherry Miranda Rights. Duly note: O'Reilly did not write a investigation report detailing the events of the arrest, or the alleged conversation that took place between him and Cherry until six months later, ironicly, one day before the suppression hearing.

Based on the officer(s) testimony a trier of fact has to conclude somebody is fabricating the details of the arrest, for O'Reilly to observe

that which he claims occurred, compared to the testimonies of Gamboa, and Brazac, both testified to seeing Cherry exit the vehicle only after Cherry had already seen the officers arrived at the scene, also, for Gamboa to have been the "first" officer to approach and physically place his hands on Mr. Cherry, and stated he did not have to run after Cherry, this testimony contradicts O'Reilly claim that Cherry was seen positioning himself and then fleeing, and at no time was Cherry in the vehicle with O'Reilly, if it's Gamboa testimony that Cherry was his responsibility, and that he stood by him the entire time while the officer(s) searched the vehicle. A trier of facts has to conclude that Cherry certainly can not be in two places at one time. As stated in Alcantar, the laws of nature makes it physically impossible for O'Reilly claims of events to be factual. The prosecution knew or should have known because they were privileged to have access to all of this information prior to Mr. Cherry trial. Wherefore, Cherry had to reveal this information by going to trial, and placing the officer(s), who all conspired to deny Cherry his Constitutional and Civil Rights, under cross-examination.

3) The last piece of evidence that exposes the false statements of the officer(s), namely O'Reilly is the informant recording device, it is the only reliable, truthful evidence that the Court(s) can actually rely on, for a fair and accurate determination of cause. The recording device is not favorable to either party, it simply recorded the events as it took place. Mr. Cherry instructed his attorney Andrea' E. Gambino to get the informant recording device tape enhanced, so that the defense could hear clearly the contents of the conversation, and also, determine if the tape had been altered by the government or

by law enforcement. Counsel never had the tape or device inspected for any alterations or foul play that may or may not have occurred. Cherry state under penalty of perjury, pursuant to 12 U.S.C § 1976, that he paid for these services through his attorney $2500.00 but never received any results or refund. Cherry contends that law enforcement did infact tamper with this evidence, because this evidence in it's original state would have recorded the details of the conversation in it's entirety, depicting that Cherry was not meeting with the informant to engage in any criminal activity. However, upon listening to the enhanced version of the tape, Cherry pointed out to Counsel, the sound of the first door opening, which is the informant giving the arrest signal, next you hear the sirens as law enforcement arrived on the scene, then you hear a second car door opens, which is Mr. Cherry exiting, and officer(s) yelling commands to Cherry.

- This tangible evidence corroborates Brazao testimony that "once I pulled up I saw Mr. Cherry getting out in my peripheral vision."
- This tangible evidence corroborates Gamboa testimony that "upon seeing us Cherry exit."
- What this tangible evidence "does not" corroberate is O'Reilly elaborate chain of events.

Likelihood that the false testimony affected the judgement

The testimony of O'Reilly has been used to validate the district Court, and Court of Appeals opinions concerning the probable cause determination, which ultimately affected Cherry's substantial rights depriving him of his liberty.

"Upon hearing police, defendant attempted to run into his car and escape before the police could assist him, evidencing knowledge of guilt. These facts taken together are sufficient to establish probable cause to arrest the defendant".

The Court(s) has "intentionally" ignored or rejected Cherry meritorious - Fourth, Fifth, and Fourteenth Amendment claims every chance at almost every level, but when the Court(s) are faced with these clear and convincing prosecutorial misconduct, and false statements made by law enforcement, this honorable Court has an obligation to give consideration a more thorough review of the issues in which Mr. Cherry contends. A Judge's oath entails "I will defend the United States Constitution against all domestic invaders", Clearly, the prosecution team is attempting to circumvent the Constitution.

In light of these false statements, the question becomes what length is the prosecution team willing to go, or has went thus far, in order to deny Mr. Cherry the protections of the United States Constitution?

Mr Cherry has articulated the claim and presented the court with the false testimony, shown how the prosecution knew or should have known the testimony was false, and how the false testimony has affected the Judge(s) decision making hopper, with that being said, the jury was also under the impression that the officers was testifying truthfully, so their decision was based on false testimony, which under the Seventh Circuit law William D. Avery v. City of Milwaukee, et al, 847 F.3d 433, 2017 "Falsified evidence will never help a jury perform it's essential truth-seeking

function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process. Trial Counsel was ineffective for not pointing out the false testimony and causing doubt in the minds of the jurors. Counsel ignorance, inattention or lack of diligence in his investigation about a point of a law that is fundamental to his case, is a quintessential example of unreasonable performance. Hinton v. Alabama, 571 U.S 263, 134 S.Ct. 1081, 1089 (2014).

A jurist of reason would find Cherry has met the requirements for relief under Morales v. Johnson, 659 F.3d 588, 606 (7th Cir. 2011) in that the government presented false evidence against Mr. Cherry, which they knew was false, resulted in a due process violation. Without the false evidence the prosecution team can not justify the arrest of Mr. Cherry, Probable Cause is lacking. When an officer has to create a false statement to justify the officer(s) actions, this sends a clear message that officer(s) knew their actions was not in conformity with Federal law, or the United States Constitution. What's relevant is not the claim, but the fact officer(s) created the false evidence, and for these reasons Ground Five should be granted a Certificate of Appealability.

Ground Six involves Mr Cherry ability to confront his accuser, namely the informant, which is understood as a "guaranteed right" under the Sixth Amendment of the United States Constitution. The government has held the identity of the informant, preventing the defense from calling the informant to testify at Mr. Cherry trial.

The Supreme Court has said that "where the disclosure of an informant identity, or of the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of cause, the privilege [or withholding a confidential informant's identity] must give way." Rovario v. United States, 353 U.S. 53, 60-61, 1 L.Ed.2d 639, 77 S.Ct. 623 (1957).

The government contends that "the cooperating informant was not an occurrance witness to the offense in which Cherry was charged, namely, the actual possession of the heroin and cocaine found in Cherry's automobile at the time of his apprehension". Contrary to the government contentions, Mr. Cherry is charged with possession with "intent to distribute" a controlled substance. Wherefore, the cooperating informant is an active participant witness to the charge of possession with intent to distribute. The government opening statement to the jury makes it clear that the informant was indeed a witness to the instant offense. The government stated to the jury "Cherry possessed the heroin that evening because he planned to return it to his supplier." Tr. Tr. pg 147, 4-7

Cherry has proving in Ground Five the presentment of false testimony supplied by officer(s), therefore, it becomes abundantly clear that the need to gather all the "facts", from those supplying information implicating Cherry in criminal activity, namely the informant, is imperative in the instant case, so that the decision making body can render a just and fair determination of cause, because when

We exclude the false testimony, the only information the Court(s) have to consider is the words in which the informant "allegedly" said to law enforcement, Clearly the informant said something, but as to what that something was, is unknown to the defense and Courts, in light of the officer(s) who the Court(s) now knows have the tendency to lie, fabricate evidence, present false testimony, and be untruthful, a trier of fact can no longer test their determination on witness's who is known to commit acts of perjury.

Cross-examination has been called "the greatest legal engine ever invented for the discovery of truth". Criminal defense attorney's must jealously guard the right to full and complete cross-examination, and should challenge any restriction on cross-examination imposed by a trial judge. Counsel(s) was ineffective for failing to call the informant to testify. The defense nor can a trier of fact say with "Certainty" what the informant said to the agents. So the miscarriage of Justice occurs at the moment the Court(s) is solely relaying on the officer(s) testimony, testimony in which the Courts know is false.

The district Court denial of Cherry's motion to disclose the identity of the informant violated Mr. Cherry constitutional right to place the informant credibility, veracity, and reliability through the meaningful adversarial testing. The informant is the "only" accuser in the instant case that allegedly claims Mr Cherry was involved in Criminal activity. The government has not presented any signed proffer's or documentations that these are the signed and actual words of the informant. The informant has not appeared in front of any Judge or stood in any Courtroom to swear, state, declare, verify, or certify

under the penalty of perjury about any information concerning Mr. Cherry. Instead, we have officer(s) whose shown to have created fabricated evidence against Mr Cherry, therefore, it becomes extremely imperative under Crawford v. Washington, Rovario, Crane, Cronic, Meyer, and Williams, all which the Seventh Circuit Court of Appeals uses as guide post in determining governing law, that Cherry is afforded the opportunity to cross examine the informant for authentication purposes.

As a matter of law, law enforcement hearsay statements are not credible. Mr. Cherry has a "constitutional right to have the prosecution case encounter and survive the crucible of meaningful adversarial testing". See United States v. Cronic, 466 U.S. 648, 656 (1984); Also, The Supreme Court did not limit the exclusive providence of the jury to the credibility of witnesses, "it allowed", any part of the prosecution case to be shown to be unworthy of belief. Crane, 476 U.S. at 688-89 See also, exposing possible "bias is a proper and important function of the constitutionally protected right of cross-examination" United States v. Meyer, 157 F.3d 1067, 1080 (7th Cir. 1998) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)) Under Seventh Circuit law, hearsay testimony about an informant tip containing a specific charge of criminality can be extremely predjudicial because the jury may believe the testimony without any guarantee that it represents the truth. United States v. Williams, 133 F.3d 1048 (7th Cir. 1998) (citing United States v. Lovelace, 123 F.3d 650, 654 (7th Cir. 1997)

The importance of cross examination of the informant goes to the core of Mr Cherry defense. The government contends, in order

to compel disclosure, a defendant must establish that the source identity is "relevant and helpful" to the defense or "essential to a fair determination of cause". Roviaro, 353 US at 60-61, 77 S.Ct. 623. The identity of the informant gives the defense an in-depth look into his background, such as, the informant criminal history, there's a probability the defense would have discovered that the informant has giving false information to law enforcement in the past, which goes directly towards the credibility of the informant veracity and reliability. The government has withheld this information, and this is the type of information that is relevant and essential to a fair determination of agents acting reasonable in conducting a warrantless arrest, which will ultimately rest upon a fair and accurate probable cause determination, because it's the totality of the circumstances - "The Whole Picture" - analysis that's in question for the defense.

Mr. Cherry would like to remind the Court at this time, that it's not required of him to show what the informant will exactly say, if called to testify, only that if the informant was called to testify, there's a probability that the outcome of the trial will be different.

Based on the information that the agents provided, namely, Agent Crawford stated "I was surprise to see drugs in Mr. Cherry car, the informant never stated anything about he was to received drugs from Mr. Cherry". So there's a strong probability that if called to testify, the informant would testify that the statement Cherry made was false; which the government should have known, after all, the informant is a part of the prosecution team, and if the government knew this, but

ignored the informant, and presented this statement knowing it was a false statement, then the government has violated not only the Confrontation Clause, but Cherry's right to due process as argued in Ground Five, and this would explain the strong incentive to withhold the identity of the informant and prevent the defense from cross-examining the informant, also, this is why Counsel did not call the informant to testify. Counsel Gambino was under a conflict of interest, which played into her rationale thinking causing her deficient performance, had Counsel called the informant to testify, there's a strong "probability" the defense would have revealed what the government knew, exposing their illegal practices of withholding exculpatory evidence.

The Confrontation Clause of the Sixth Amendment essentially guarantees a criminal defendant's right to a face-to-face confrontation with his or her accuser. The government use of statements from the informant against Mr Cherry at trial, deprived Cherry of the advantage of that personal presence of the witness, **before** the jury, which the law has designed for Mr. Cherry protection. It is the jury obligation to view the witness, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. The government entire case at trial rest upon "what the informant allegedly said to officer(s). Any statement offered into evidence that would tend to incriminate the defendant should have been inadmissible as hearsay, since the cooperating witness was not available to testify at trial

The Supreme Court in Crawford v. Washington, 541 U.S. 36 (2004) holding that the Confrontation Clause excludes "any" evidence that is testimonial in nature if the witness is not available. A jurist of reason would find that the government and district court denied the defense the opportunity to counter any prejudice, and as a result deprived the defendant of a fair trial, for these reasons the Court should grant Ground Six a Certificate of Appealability.

Ground Seven is centered around the judicial bias Mr. Cherry has received throughout the entire proceedings - from beginning - to now, it's an on-going claim, because the Court(s) are persuaded by fabricated evidence presented by the prosecution team, this prosecutorial misconduct denies the defendant right of an impartial judge. See United States v. DiDomenico, 78 F.3d 294, 299 (7th Cir.) 117 S.Ct. 507 (1996).

Mr. Cherry avers that every meritorious and viable Constitutional claim has been met by the district judge with unreasonable findings. Cherry understands a judge can interpret the record, but the United States Constitution and federal law "does not" permit a judge to "modify" the record. The moment judge Ronald A. Guzman changed what officer(s) testified to, and applied these modified testimonies into the factual findings of the Court opinions to determine guilt, deprived Mr. Cherry to a fair and accurate proceedings, which ultimately deprived him of his liberty, certainly this act was prejudicial to Cherry. Namely, when the judge stated in the Court opinion forming his decision on Probable Cause, the Court stated, "The officers had Probable Cause

when the defendant had arrived at the predicted place, at the predicted time"... This judicial analysis was grabbed out of thin air, No where does the record support such an opinion. The officer(s) testified that they lured Mr. Cherry to 159th Kedzie, it was law enforcement idea, not the words of the informant. Now if the informant had told the Agents that Cherry would arrive at 159th and Kedzie at a specific time, because this was a prearrange meeting location, then Mr. Cherry argument would be frivilous. Instead it was the officer(s) who told the informant to call Cherry and "only" ask can he meet with the informant on 159th and Kedzie. This is a huge difference then how the district court modified the testimony of the record. See Supp. hr. pg 6 11-12

11. So we moved the location to a 159th Street and Kedzie

12. in a Strip Mall

This makes it clear and convincing that the judge modified the record to make the appearance of corroberation of the informant claims relevant to his bias probable cause determination. So as a matter law, the judge(s) opinion is wholly without foundation.

To prevail on a claim of judicial bias, Plaintiff bears a heavy burden. "this court begins with the presumption that the hearing officer is unbiased" and "it is only after a Petitioner has demonstrated that the decision maker displayed deep seated an unequivocal antagonisms that would render fair judgement impossible that the presumption is rebutted. See Liteky v. United States, 510 U.S 540, 556, 114 S.Ct. 1147, 127 L.Ed. 2d 474 (1994).

A jurist of reason would find this to be debatable, because an impartial fact finder could have never misinterpreted the officer(s) testimony to mean anything other than what was stated, unless the judge was bias to the defense and was stuck on convicting the defendant, regardless to his Constitutional rights to be free of unreasonable searches and seizure's, which is guaranteed unto Cherry under the Fourth Amendment of the United States Constitution. It's the judge main function to insure that Mr. Cherry is afforded the protections set forth in the Constitution. To abandon this obligation is unquestionably prejudicial towards Mr. Cherry, but it also shows that the judge "intentionally" joined into a conspiracy with the prosecution team to deny Mr. Cherry his Constitutional and Civil Rights.

Law enforcement "only" stated in their affidavit to support probable cause (excluding the false statements), as well as their suppression hearing testimonies that, based solely on what the informant said, we formulated a plan to get Mr. Cherry on "tape" on how he intended to receive the 13 kilograms of cocaine, and at that time we were to arrest Cherry. See Supp Tr. pg 6. Officer(s) does not state that Cherry arrived at a predicted place at a predicted time. Instead the record is clear that officer(s) formulated a plan, created the parking lot scene for the sole purpose of "gaining" incriminating evidence which could corroborate that Cherry was engaged in criminal activity, and at that time, not when Cherry pulled into the parking lot, but at the time the informant secures the "necessary" evidence that Cherry is engaged in criminal activity.

Cherry wants to direct the Court attention to Exhibit C, the informant Recording device transcript.

CS: I'm here. I seen you pass by. I'm in the itty bitty car. Yeah, I see you. You're right behind me. Yeah, you're right behind me. Yes sir.

This tangible evidence proves that Mr. Cherry does not know what type of vehicle the informant is in, or where he is parked. According to the recording transcript, Cherry is right behind the informant and does not even know that the informant is in front of him. Cherry had to get a detail description of the informant vehicle, in order to determine where the informant is parked. However, the bias judge(s) states "Cherry "circled" the parking lot as though assessing the safety and privacy of the situation," and then parked next to the confidential informant car. This is what Cherry is referring to, when he say the Court grabbed an interpretation out of thin air, because the Court's interpretation does not exist at all on the record. To be clear, the Recording device transcript makes it "obvious" that Mr. Cherry is looking for the informant.

This tangible evidence also makes clear that the district Court has ignored, and excluded all evidence intelligently and intentionally that corroborates Mr. Cherry claim that he was illegally arrested without Probable Cause. The district Court ruled that the conversation between Cherry and the informant is irrelevant to the Probable Cause determination because officer(s) could not hear that conversation in Real Time. This is how the Court gets around considering this tangible evidence. The conversation between Mr. Cherry and the informant is the [redacted] required information that's necessary to make an arrest. If a reasonable person, knowing all of the facts and circumstances

Known to this officer, would believe that the individual in question has committed or is committing a crime. See Seiser v. City of Chicago, 762 F.3d 647, 654 (7th Cir. 2014). The point that Cherry makes is that the Court modified the "Facts and circumstances known to the officer(s)". Officer(s) did not know if the informant was truthful or reliable, this area of uncertainty is the purpose of instructing the informant to engage Cherry in conversation about receiving the drugs. The entire Reverse-sting hinges on the conversation between Cherry and the informant. Wherefore, if the court states that the conversation is irrelevant because officer(s) failed to equipt the recording device with a transmitter, so that they may know all the facts and circumstances in which Mr. Cherry is there to meet with the informant prior to the arrest, then the Court is required as a matter of law to consider that the lack of articulate suspicion dictates to the trained officer, that probable cause is lacking when the informant gives the arrest signal and officer(s) moves in to arrest Mr. Cherry.

The Seventh Circuit has consistently ruled:

The Fourth Amendment of the United States Constitution requires that Probable Cause be individualized - not just to the time of arrest, but specific to each defendant. Ybarra v. Illinois, 444 U.S. 85, 91 (1979) Generalized suspicion alone is not enough to justify a warrantless... seizure of a person. United States v. Johnson, 170 F.3d 708, 710 (7th Cir. 1999) A "persons mere propinquity to other's independantly suspected for criminal activity does not, "without more", give rise to Probable Cause". Ybarra v. Illinois, 444 U.S. at 91. In short, " it is not unlawful for

someone to be in the company of another". United States v. Williams, 341 US 58, 64 n.4 (1951) "To be present at a crime is not evidence of guilt as an aider or abetter". Ellis v. United States, 499 F.3d at 690 "mere presence at the scene of a crime is not enough to establish probable cause". To justify the initial contact, the totality of the evidence "must" justify a reasonable and articulable suspicion that the defendant was involved in illegal drug activity. United States v. Rodriguez, 831 F.2d 162, 165 (7th Cir. 1987).

Based upon these clear guide posts, the district Court refusal to grant Mr. Cherry relief as the Seventh Circuit law demands, constitutes judicial bias at it's best. A jurist of reason would find it debatable that the district court intentionally excluded the one evidence from the Courts conclusion that proves Mr. Cherry claim that he was illegally arrested without probable cause.

During Mr. Cherry trial the judge continues to display his bias, when he interjected himself and played the role of the prosecutor. O'Reilly was on the witness stand testifying on recross about the "Fabricated" report and conversation he allegedly had with Cherry. Tr.Tr. pg 325, when the prosecutor Ms. Fernandez Harvath made an objection, the Court sustained, defense counsel requested a side bar, the Court granted, defense counsel asked the basis for objection? before the prosecutor could respond, the judge was in prosecutor mode, his body language was aggressive, then after the judge scolded the defense with his "First of all", and "Second" reasons for the objection, the judge turns to the prosecutor, no longer is his body language

Aggressive, and he asked, Was that your objection? At this point there's no assuming that the judge "probably" missed the meritorious and viable information on the informant recording device, or that it was by accident the judge missed the testimonies of the officer(s), in that the laws of nature make it physically impossible for the events to have occurred as the officer(s) claimed the seen them unfold, At this stage, it becomes clear and obvious that the judge is no longer impartial, this judicial bias explains why the judge allowed the government star witness, O'Reilly, to sit-in at the prosecution table, and view the defense line of questioning, this strategic technique gives the "one" whose shown to fabricate evidence, (even if not proven at that specific time, the Court was well aware, that the defense was clearly challenging O'Reilly's claims about the details of the arrest) the advantage of knowing prior to testifying, where the defense is headed, also, the opportunity to hear his fellow officer(s) testimony, So that he may tailor his testimony accordingly.

Cross-examination has been called "The greatest legal engine ever invented for the discovery of truth." By allowing the prosecution team to circumvent this Fundamental, Substantial, Constitutional Right is a clear violation of The Right to a <u>Fair trial</u>.

The judge even allowed the government to restrict facts and circumstances to the jury. See Tr.Tr pg 290. A clear violation of Due Process of Law. Every defendant, especially those who exercise their Constitutional right to proceed to a jury trial, has a "<u>guaranteed</u>" Right under the Fifth, and Fourteenth Amendment of the United States

Constitution to be judged upon "Factual" and "Accurate" information.

The essential function of Habeas Corpus is "to give a prisoner a reasonable opportunity to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence". See Davenport, 147 F 3d 605, 609 (7th Cir. 1988), citing Carafas v. LaVallee, 391 U.S 234, 238 (1968), Price v. Johnston, 334 U.S 266, 283 (1948).

For these reasons, a jurist of reason would find it debatable that the district judge afforded Mr. Cherry a reliable judicial determination of the fundamental legality of his conviction and sentence, however, a jurist of reason would find that the district judge departed from his role of impartiality, and subjected Mr. Cherry to judicial bias. Ground Seven is entitled to a Certificate of Appealability.

## Conclusion

Mr. Cherry/Petitioner respectfully moves this Honorable Court to grant a Certificate of Appealability, and to allow this motion to be the actual brief (if any other brief is necessary or required) for this Court consideration regarding Cherry's meritorious and viable Constitutional claims, and if there is to be a subsequent proceeding, please appoint Counsel to represent Mr. Cherry, and to grant a reasonable bail during the pendency of the proceeding.

Respectfully Submitted

By. DeAndre Cherry

## AFFIDAVIT

I have drafted this petition myself, I hereby declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct, such petition, and declaration(s) submitted along with it, are tantamount to affidavits (LaFuente v. United States, 617 F.3d 944, 946 (7th Cir. 2010)

DeAndre Cherry
(pursuant to 12 U.S.C § 1976)

## CERTIFICATE OF SERVICE

I certify that I have placed 1-original and 3-copies of this motion to SEEK A Certificate of Appealability with the Court of Appeals in the legal mail here at FCI-PEKIN for delivery to the United STATES Court of Appeals for the Seventh Circuit, Everett McKinley Dirksen United States Courthouse Room 2722 - 219 S. Dearborn Street Chicago, Illinois 60604 in a sealed envelope with postage pre-paid on this 1 day of September, 2021

DeAndre Cherry

DeAndre Cherry
REG# 42433-424
Federal Correctional Institution - PEKIN
P.O. Box 5000
PEKIN, ILLINOIS 61555

Exhibit A

I. CHARGES BASED ON RESULTS OF ILLEGAL SEARCH & ARREST

A. NO PROBABLE CAUSE FOR ARREST: NO OBSERVATION OF ANY ILLEGAL ACTIVITY

1. INFO PROVIDED BY CI NOT CORROBORATED
   a. location
   b. identity of person
   c. intent to accept delivery
   d. Knowledge that drugs were in the car

2. NO Flight - not corroborated by testimony or tape

B. DRUGS NOT IN PLAIN VIEW
1. No Basis for searching car
2. Logical interpretation of Photos supports Closed Bag First
3. AGENT Testimony by First to see car - No Plain View
4. METEDATA DESTROYED that would have provided Evidence

PRESUMPTION AGAINST GOVERNMENT BASED ON DESTRUCTION OF EVIDENCE, FAILURE TO TURN OVER
BAD FAITH EVIDENCED by Knowing that Photos TAKEN in prep. for Litigation

II AGENTS BELIEVED THAT CI GOING TO DELIVER DRUGS TO MO

A. Belief was False - CI Did not tell the truth

Told Cherry he was delivering car to someone else

III DEA AGENTS CANNOT TESTIFY TRUTHFULLY about BACKGROUND without including CI

A. Explanation of why Agents were present where they arrested DC was because informant claimed he would be there to Accept Delivery of Drugs

1. Can't truthfully explain why they were there without CI

2. Arrested and released informant, followed him to Parking lot

NOT TRUE, MISSTATED FACTS - They told him to go to the Parking lot

3. "Observed white SUV circling the area in suspicious manner"

misleading - circling because did not recognize or know car that CI was in

4. "Get in and out of car and flee"

Not consistent with tape.

5. Heroin not in plain veiw in car

IV FACTS RELIED ON BY COURT INCLUDE AGENTS RELIANCE ON CI'S INFORMATION BEING CORROBORATED - NOT ACCURATE ASSESSMENT AND IN OPPOSITION TO TAPE

V. NO EVIDENCE TO SUPPORT FLIGHT, TESTIMONY OF AGENTS, PLACEMENT OF CARS, TAPE RECORDING - NO SUPPORT FOR BALD ASSERTION

VI. GOVERNMENT HAS IT BACKWARDS: NO PROBABLE CAUSE TO SEARCH CAR, PETITIONER ARRESTED BEFORE ANY (FABRICATED) PLAIN VIEW HAPPENED

THERE WAS NO PLAIN VIEW

ARREST DEPENDED ON WHAT AGENTS ASSUMED HAPPENED: ACCEPTANCE OF DRUGS IN CI CAR - BUT THEY JUMPED THE GUN - THERE WAS NO EVIDENCE OF ANY ATTEMPT TO ACCEPT THE CAR OR DRUGS - NO BASIS FOR ARREST - PROBABLE CAUSE LACKING

VII. METADATA: EXCULPATORY AND NO SUBSTITUTE FOR EVIDENCE OF ORDER IN WHICH PHOTOS TAKEN AND WHERE THEY WERE TAKEN

A. GOVERNMENT KNEW AT THE TIME OF THE SUPPRESSING HEARING THAT THE ORDER IN WHICH THE PHOTOS WERE TAKEN WOULD BE A ISSUE

IT WAS ASKED ABOUT BY SUPPRESSING HEARING COUNSEL, COUNSEL CALLED THE PHOTOGRAPHER TO TESTIFY, AND HE DID NOT REMEMBER, METADATA WOULD HAVE PROVIDED CONCLUSIVE EVIDENCE OF THE ORDER IN WHICH PHOTOS WERE TAKEN AND WHERE THEY WERE TAKEN

THIS WAS KNOWN OR SHOULD HAVE BEEN KNOWN TO

THE GOVERNMENT AT THE TIME OF THE SUPPRESSING HEARING

GOVERNMENT'S FAILURE TO CALL THE PHOTOGRAPHER OR PURSUE THE EVIDENCE IT HAD IN IT'S POSSESSION WAS SIGN OF BAD FAITH AT WORST AND OSTRICH BEHAVIOR AT BEST- FAILING TO ENQUIRE, DESPITE REQUESTS FOR FEAR OF LEARNING THE ANSWER.

B. THREE PART TEST MET

1. BAD FAITH IN KNOWING ISSUE AND DESTROYING EVIDENCE (CAN'T PRESUME IGNORANCE OF CAMERA OF INFO

2. WOULD HAVE BEEN APPARENT IF LOOKED

3. DEFENDANT TRIED TO GET INFO BY OTHER MEANS- QUESTIONING THE PHOTOGRAPHER, BUT HIS MEMORY FAILED- COULD HAVE CHECKED THE METADATA, KNEW HE HAD IT, KNEW IT WAS AT ISSUE

- NOT LIKE STALLWORTH, BECAUSE HERE KNEW OF EVIDENCE AND FAILED TO PRODUCE IT

4. DISPOSED OF CAMERA AFTER HEARING BUT BEFORE TRIAL

I FAT GUY / INFORMANT

- NEVER USED HIM AS INFORMANT BEFORE
- NO IDEA WHETHER HE WAS TRUSTWORTHY OR NOT
- CAUGHT WITH A LARGE LOAD OF DRUGS
- TRYING TO WORK HIMSELF OUT OF TROUBLE
- HAD BEEN IN TROUBLE BEFORE

- HAD AT LEAST ONE FEDERAL FELONY: LOOKING AT 10 OR 20 YEAR MANDATORY MIN. BASED ON AMOUNT OF DRUGS HE WAS CAUGHT WITH
- ON FEDERAL SUPERVISED RELEASE AT TIME OFFENSE
- DID NOT HAVE PERMISSION FROM THE COURT TO ACT AS INFORMER OR ASSIST LAW ENFORCEMENT - AS REQUIRED
- NO REAL NAME FOR MO
- DIDN'T CORROBORATE INFORMANT ALLEGATIONS OF CRIMINAL ACTIVITY - CONCERNING MO AT ALL.
- DIDN'T IDENTIFY HOUSE WHERE TRANSACTION WAS SUPPOSED TO HAPPEN
- INFO ABOUT "MO" NOT VERIFIED:

  GANG MEMBER: denied

  MULTI-KILO DRUG DEALER: denied

  DRUG TRAFFICKING ORGANIZATION: NOT identified & denied.

II SURVEILLANCE

- NO VIDEO SURVEILLANCE

  did NOT RECORD what you WERE observing, while observing it, NO ONE else did either

- AUDIO SURVEILLANCE Limited

  device only records, NO transmission

  DID NOT HEAR CONVERSATION

  NO WORDS ABOUT DRUGS

  NO WORDS ABOUT MONEY

relied entirely on Information from Informant, and relied entirely on Informant to follow instructions

- DID NOT SEE A TRANSACTION

NO EXCHANGE BETWEEN INFORMANT / CHERRY

NO ATTEMPT BY MR. CHERRY TO TAKE ANYTHING OUT OF CAR – INFORMANT vehicle.

NO ATTEMPT BY MR. CHERRY TO GIVE INFORMANT ANYTHING

- CAR DRIVES AROUND PARKING LOT – DOESN'T SEE OR RECOGNIZE "FAT GUY" vehicle

III ARREST

INFORMANT OUT OF CAR

AGENT BRAZAO PULL UP BEHIND BOTH vehicles

CHERRY exit INFORMANT CAR – IMMEDIATE ARRESTED

IV PHOTOS

- NO ACCOUNTABILITY AS TO WHO ARRANGED THE CONTENTS OF THE Satchel FOR THE PhotoGrapher
- NO ACCOUNTABILITY AS TO WHO ARRANGED / OPEN / CLOSED THE Satchel FOR THE PhotoGrapher
- CLOSED SATCHEL displays water (mottle) marks as Agent TESTIFIED TO, BUT OPEN Satchel displays NO water (mottle) MARKS ON THE CONTENTS protruding from the Satchel.

PROOF that Photos were NOT TAKING AT SCENE OR WAS IN PLAINVIEW, it was raining hard the night incident occurred

RAIN would be visible in every Photo if it happened as officer's testified

- CAMERA USED WAS NOT DEA EQUIPMENT / NOT POLICE EQUIPMENT

V. SUPPOSED TRANSACTION:

NOT WHAT EXPECTED

INFORMANT LIED

VI. RETURNED PROPERTY

CAR - NO INVENTORY, NO IMPOUNDMENT, Vehicle was in no way Secured.

Satchel - Giving to attorney Susan Shatz

VII. MIRANDA Rights

O'Reilly lied. Fabricated entire story

I was with Ofc. Gamboa standing in the Rain

Did not get read Miranda Rights until June 1, 2012

Never stated a willingness to cooperate

Walsh and Gamboa investigation Report reads:

S. Cherry stated that he had no information regarding any unsolved murders or shootings, Cherry denied any knowledge of any leaders of drug sale organizations, Cherry stated he did not know any street source of Firearms

Exhibit B

# O'Reilly Impeached

| | |
|---|---|
| Tr.Tr pg 296 2-3 | I started driving slowly towards the with my lights out (Gamboa testimony is in direct conflict) |
| Tr.Tr. pg 390 3-4 | Did you guy's move your spot? Not for a while |
| Tr.Tr. pg 296 6-17 | moments later, Mr. Cherry was also opening his door, & stood up & he was turned around to look inside the back of the Volkswagen. (Gamboa testimony is in direct conflict) |
| Tr.Tr. 390 21-22 | Defendant Cherry upon seeing us exit, very quickly tried to get into his vehicle (Brazao testimony is in direct Conflict w/ O'Reilly) |
| Supp. Tr. pg 12 18-19 | Once I-- I pulled up to the vehicle, I saw Mr. Cherry getting out in my peripheral vision. (informant recording device is in direct Conflict) |
| See Judge Memorandum Opinion & Order [92] pg 3 | "The new evidence seems to corroborate that Defendant got out of the cooperating individual's automobile and was immediately confronted by sirens and officer's shouting at him, "Don't move. Don't move". On the tape you can hear when the CI opens the car door, next you hear sirens, then you hear a second car door opens, & then you hear officer's yelling. |

# O'Reilly Impeached

Tr. Tr. pg 297 13-17: At that point, I picked up -- Gamboa and I both searched Mr. Cherry to make sure there was no weapons on him -- none were found - and I placed him in my vehicle.

(Gamboa testimony is in direct Conflict)

Tr. Tr. pg 395: And what did you do after you got him up off the ground, we went to the rear of the vehicle, & what did you do there? I just stood by him, & you stood by him for how long? For a good period while the investigation continued.

(Crawford testimony is in direct Conflict w/ O'Reilly)

Supp. Tr. pg 83 10-12: After I got into the area, I observed Mr. Cherry on the ground in the rear of the Mercedes, outside the car, being handcuffed by several agents.

(MacDonald testimony is in direct Conflict w/ O'Reilly)

Tr. Tr. pg 260 17-25 & continue on pg 261, 1.: Well, I saw the front door. The driver's side door was open, so I approached that part of the vehicle, & I saw a briefcase in the passenger ~~side~~ seat. Q. Okay. And I'll get to the briefcase in a second, but when you walked up, did you actually see Mr. Cherry being placed under arrest? A. Yes. He was being arrested yes. Q. And what did you see happening at that time? A. I just heard he was -- he was being given instructions & he was being handcuffed.

Note: O'Reilly testified that he had me down below at his feet while he looked through the car, So basically I'm on the ground right outside my driver's side door, so it's impossible for someone to look inside the driver's side door as I'm being arrested, for we'll be blocking the Path. Also, according to O'Reilly, after

# O'Reilly Impeached

he looks inside the vehicle, he places me inside his car and we drives away from the search. Then why is Crawford & MacDonald testifying that they were able to look in the drivers side door, but also see Mr. Cherry being arrested? Gamboa said that he stood me up & placed me at the rear of the vehicle see Tr.Tr. pg 896-5. "My primary focus was the defendant. I was watching him". So if Gamboa primary focus was me, then how am I with O'Reilly being read my Miranda rights & talking about cooperating? Who I'm with? Remember the government did not cross examine Gamboa, So they conceded-agreeing to everything he testified too.

---

Tr. Tr. pg 811 — No one was yelling, "Stop," or whatever -- <u>you made up earlier.</u>

See Judge Memorandum Opinion & Order (92) pg 3 — (well the Informant Recording Device is in direct Conflict) Officer's yelling don't move

NOTE: O'Reilly being combative with the defense Attorney, telling the jury that she made that up, but my lawyer didn't present this evidence at trial - proof she was ineffective

---

Tr. Tr. pg 324 1-16 — Agent O'Reilly, with respect to this conversation that supposedly happened in your car with Mr. Cherry, did you record it in any way? A. No. I did not (again was asked)

Tr. Tr. pg 326 — And you didn't take any steps to record that statements in any way, did you? A. No, I did not. Q. Agent O'Reilly, you didn't use any kind of recording device on that conversation, did you? A. No

# O'Reilly Impeached

Now that's two times he was asked in any way did he record it, and after five objections by the government and a side bar where the judge plays prosecutor, O'Reilly comes into conflict with his own testimony.

TR. TR. pg 326 14-16 A. I took notes that night, but I did write a report
Q Until November of 2012. A. Yes ma'am.

He just switched his testimony before the Court and jury. The problem with a lie, is that you create more problems. Now the Defense never received these notes in the discovery or before trial. - Brady violation -

This is the only recorded conversation!

Exhibit C

(Phone rings.)

**CS:** I'm here. I seen you pass by. I'm in the itty bitty car. Yeah, I see you. You're right behind me. Yeah, you're right behind me. Yes sir.

**CS:** 'Sup my brother? You wanna hop in? Or you want me to...

(Unintelligible)

**CS:** Huh?

**DeAndre Cherry:** You're acting too fucking weird.

**CS:** Man, I went over there. Ain't nothing over there. All there were was these fucking cars and they all had tinted windows and they were all brand new with no plates and shit.

(Unintelligible)

**CS:** Huh?

**DeAndre Cherry:** Where at?

**CS:** Right on 147th. Right by Loomis and shit. I was like 'What the fuck?'. So I drove and I came around and I was like 'What the fuck?' and the boy didn't wanna drive his car so I had to fucking drive it.

(Muffled voice)

**CS:** I don't like driving with this shit bro.

**DeAndre Cherry:** You got it right now?

**CS:** Huh?

**DeAndre Cherry:** You got it right now?

**CS:** Yeah.

(Unintelligible)

**CS:** Huh?

(Unintelligible)

**CS:** I just came over here. I was like fuck this, I wanna go over here. I was just driving around

and I said fuck it I'm gonna go right here. I gotta see somebody right by here. I was gonna give them the fucking car right now.

**DeAndre Cherry:** Oh, ok.

**CS:** I've been here before.

(Unintelligible conversation)

(Police sirens)

Exhibit D

## [4] Warrantless Probable Cause Determination

Although a **determination** of whether **probable cause** exists is dependent on the particular facts of a case, as a general proposition, a **warrantless arrest** will be supported by **probable cause** if the officers' knowledge was "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." 20

**Probable cause** necessarily varies between warranted and unwarranted procedures. This variation arose from the practical application of the **probable cause determination**, rather than from a legislatively- or constitutionally-defined variation in applicable standards. There is also an inherent bias by the courts in favor of warrants, to the point that **warrantless** searches for many years were considered per se unreasonable. 21 The standards for a **warrantless arrest** are "at least as stringent" as standards applied in a magistrate judge's assessment. 22

Other examples of the factual analysis employed by the courts in determining **probable cause** in **warrantless** cases are:

THIS IS PROCEDURE

- **Probable cause** existed for **warrantless arrest** when trained law enforcement agents could reasonably believe that drug transaction had taken place after observing both defendant's behavior, and delivery of package to automobile in which defendant waited; even though arresting officer lacked personal knowledge of some of facts, by watching final delivery and monitoring surveillance teams by radio, he had sufficient information; 23

- **Probable cause** existed to **arrest** defendant without warrant when police learned from three informants the method defendant followed in selling drugs, and during their surveillance of defendant observed the stated procedure; 24



© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

- **Probable cause** existed to **arrest** defendant when, at time officers stopped defendant, they knew from confidential informant that defendant had been dealing crack from his home and had sold crack within past twelve hours, informant was reliable source, having previously provided accurate information that resulted in seventeen other arrests and four convictions, police substantially corroborated tip by independent investigation that revealed unusual pedestrian traffic consistent with drug sales both at defendant's residence and at dwelling that defendant visited often. 25

As a consequence of the preference accorded warrants, and the need to balance warranted and **warrantless** determinations of **probable cause**, a common sense approach must be used in assessing whether the affidavit has established **probable cause**. 26 Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of **probable cause**, the resolution of doubtful cases in this area should be largely determined by the preference to be accorded warrants. 27



© 2020 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Exhibit F



3. **Application of "Single Sentence" Rule (Subsection (a)(2)).—**

(A) **Predicate Offenses.**—In some cases, multiple prior sentences are treated as a single sentence for purposes of calculating the criminal history score under §4A1.1(a), (b), and (c). However, for purposes of determining predicate offenses, a prior sentence included in the single sentence should be treated as if it received criminal history points, if it independently would have received criminal history points. Therefore, an individual prior sentence may serve as a predicate under the **career offender** guideline (*see* §4B1.2(c)) or other guidelines with predicate offenses, if it independently would have received criminal history points. However, because predicate offenses may be used only if they are counted "separately" from each other (*see* §4B1.2(c)), no more than one prior sentence in a given single sentence may be used as a predicate offense.

For example, a defendant's criminal history includes one robbery conviction and one theft conviction. The sentences for these offenses were imposed on the same day, eight years ago, and are treated as a single sentence under §4A1.2(a)(2). If the defendant received a oneyear sentence of imprisonment for the robbery and a two-year sentence of imprisonment for the theft, to be served concurrently, a total of 3 points is added under §4A1.1(a). Because this particular robbery met the definition of a felony crime of violence and independently would have received 2 criminal history points under §4A1.1(b), it may serve as a predicate under the **career offender** guideline.

Note, however, that if the sentences in the example above were imposed thirteen years ago, the robbery independently would have received no criminal history points under §4A1.1(b), because it was not imposed within ten years of the defendant's commencement of the instant offense. *See* §4A1.2(e)(2). Accordingly, it may not serve as a predicate under the **career offender** guideline.



© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

7. **Offenses Committed Prior to Age Eighteen.**—Section 4A1.2(d) covers offenses committed prior to age eighteen. Attempting to count every juvenile adjudication would have the potential for creating large disparities due to the differential availability of records. Therefore, for offenses committed prior to age eighteen, only those that resulted in adult sentences of imprisonment exceeding one year and one month, or resulted in imposition of an adult or juvenile sentence or release from confinement on that sentence within five years of the defendant's commencement of the instant offense are counted. To avoid disparities from jurisdiction to jurisdiction in the age at which a defendant is considered a "juvenile," this provision applies to all offenses committed prior to age eighteen.



© 2021 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

U.S.C.A. – 7th Circuit
RECEIVED

SEP 07 2021 SK

LIST OF Authorities — PAGE


1. Haines v. Kerner, 404 U.S 519, 92 S.Ct 594 ... 1
2. Miller-El v. Cockrell, 537 U.S at 336 ... 1, 2,
3. Flores-Ramirez v. Foster, 811 F.3d 861, 865 2, 5
4. Ybarra v. Illinois, 444 U.S 85, 91 ... 2, 4, 51
5. Michigan v. DeFillippo, 443 U.S 31 ... 3
6. U.S v. Johnson, 170 F.3d 708, 710 ... 4, 51
7. U.S v. Health, 188 F.3d 916, 922 ... 4
8. U.S v. Ellis, 499 F.3d at 690 .. 4, 52
9. Wong Sun v. U.S, 371 U.S 471, 484 .. 4
10. U.S. v. Garcia-Garcia, 633 F.3d 608, 612 ... 5
11. U.S v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 5, 6, 7
12. Carey v. Duckworth, 738 F.2d 875 7
13. Jones v. Chicago, 856 F 2d 985 7
14. Youngblood v. West Virginia, 547 U.S 867, 126 S.Ct. 2188 ... 7
15. U.S v. Olano, 507 U.S 725, 732, 113 S.Ct. 1770 ... 8
16. U.S. v. Atkins, 297 U.S 157, 160, 56 S.Ct. 391 ... 8
17. Puckett v. U.S., 556 U.S. 129, 135, 129 S.Ct 1423 .. 8
18. U.S. v. Caputo, 978 F.2d 972, 975 .. 8
19. U.S. v. Freeman, 691 F.3d 893 .. 8, 9, 10
20. U.S v. DiDomenico, 78 F.3d 294, 299 10, 30, 47
21. U.S. v. Wicks, 132 F.3d 383, 388 ... 11, 28
22. US. v. Hernandez, 58 F.3d 1145, 1149 ... 11
23. U.S. v. Rodriquez, 831 F.2d 162, 165 ... 11, 52
24. Beck v. Ohio, 379 U.S. 89, 13 L.Ed.2d 142, 85 S.Ct 223 ... 11
25. Brendlin v. California, 551 U.S. 249, 254 16

## LIST OF AUTHORITIES


| | | PAGE |
|---|---|---|
| 26 | Bailey v. U.S., 568 U.S. 186, 192 ... | 16 |
| 27 | Strickland v. Washington, 466 US at 694, 104 S Ct. . . | 17 |
| 28 | Adams v. U.S., ex rel. McCann . . . | 17 |
| 29 | U.S. v. Rusmisel, 716 F.2d 301, 310 . | 17 |
| 30 | U.S. v. Russell, 411 U.S. 423, 433 . . . | 18 |
| 31 | US v. Mayfield, 771 F.3d 417, 420. . . | 18 |
| 32 | US v. Barta, 13-3208 . . . | 19, 20 |
| 33 | U.S. v. Theodosopoulos, 48 F.3d 1438, 1444 . . . | 19 |
| 34 | Mathis v. U.S., No 15-6092 . . . | 20, 23, 24 |
| 35 | U.S v. Ruth, 966 F.3d 642 . . | 21, 23 |
| 36 | U.S v Elder, 900 F.3d 491 . . . | 21, 23 |
| 37 | Taylor v. U.S, 495 U.S 575, 602, 110 S.Ct. 2143 . . . | 21 |
| 38 | U.S v. De La Torre, 940 F.3d 938, 948 . | 21, 22 |
| 39 | Descamps v. U.S, 570 U.S at 262, 133 S.Ct. 2276, 2281 . . | 21, 22, 23 |
| 40 | Shular v. U.S., 140 S.Ct 779 . . . | 22 |
| 41 | U.S v. Garcia, 948 F.3d 789, 793 . . . | 22 |
| 42 | Scrugg v. City of Fairview Heights, 2014 U.S DIST LEXIS 30760 | 24 |
| 43 | U.S. v. Jaimes-Moreno, 2017 U.S DIST. LEXIS 203438 | 25, 33 |
| 44 | Glover v. U.S, 531 U.S 198, 121 S.Ct. 696 | 25, 26, 33 |
| 45 | U.S v. Pennington, 667 F.3d 953, 957 | 26 |
| 46 | U.S. v. Rollins, 836 F.3d 737 | 27 |
| 47 | Paters v. U.S, 159 F.3d 1043, 1046 | 30 |
| 48 | Duarte v. U.S, 4 F 3d 548, 550-51 | 30 |
| 49 | U.S v. McClinton, 135 F.3d 1178, 1192 | 30 |
| 50 | U.S v. Wicks, 132 F.3d 383, 388 | 30 |

## List of Authorities


| | | Page |
|---|---|---|
| 51 | Morales v. Johnson, 654 F.3d 588, 606 ... | 34 |
| 52 | William D. Avery v. City of Milwaukee, 847 F.3d 433 ... | 35, 36, 40, 41 |
| 53 | U.S. v. Alcantar, 83 F.3d 185, 189 ... | 36, 38 |
| 54 | Hinton v. Alabama, 571 U.S. 263, 134 S.Ct. 1081 ... | 41 |
| 55 | Rovario v. U.S., 353 U.S. 53, 60-61, 77 S.Ct 623 ... | 42, 44 |
| 56 | U.S. v. Cronic, 466 U.S. 648, 656 ... | 44 |
| 57 | U.S. v. Crane, 476 U.S. ct 688-89 ... | 44 |
| 58 | U.S. v. Meyer, 157 F.3d 1067, 1080 ... | 44 |
| 59 | Delaware v. Van Arsdall, 475 U.S. 673, 678-79 ... | 44 |
| 60 | U.S. v. Williams 138 F.3d 1048 ... | 44 |
| 61 | U.S. v. Lovelace, 123 F.3d 650, 654 | 44 |
| 62 | Crawford v. Washington, 541 U.S. 36 ... | 47 |
| 63 | Liteky v. U.S., 510 U.S. 540, 556, 114 S.Ct 1147 ... | 48 |
| 64 | Seiser v. City of Chicago, 762 F.3d 647, 654 ... | 51 |
| 65 | U.S. v. Williams, 341 U.S. 58, 64 n.4 ... | 52 |
| 66 | Davenport v. U.S., 147 F.3d 605, 609 ... | 54 |
| 67 | Carafas v. LaVallee, 391 U.S. 234, 238 ... | 54 |
| 68 | Price v. Johnston, 334 U.S. 266, 283 ... | 54 |
| 69 | LaFuente v. U.S., 617 F.3d 944, 946 ... | 55 |

## Exhibit list

Exhibit A - Quick review of the Facts and issue's (as an whole) of the entire case.

Exhibit B - False testimonies presented

Exhibit C - Informant Recording device transcript

Exhibit D - Factual analysis employed by the Courts in determining Probable Cause in Warrantless cases. (Ground One)

Exhibit E - Application of "Single Sentence" Rule (Ground Four)

Exhibit F - Offenses Committed Prior to Age Eighteen (Ground Four)